IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| JOHN J. LOONEY, SR., and DO PROCESS, INC. d/b/a BAD BOY BAIL BONDS, | CV 24–109–BU–DWM |
| Plaintiffs, | |
| vs. | ORDER |
| KAROLINA TIERNEY and J. COLLEEN HERRINGTON, | |
| Defendants. | |

In October 2024, Plaintiffs John J. Looney, Sr. and Do Process, Inc. d/b/a

Bad Boy Bail Bonds (together, "Plaintiffs") filed suit under 42 U.S.C. § 1983

against Bozeman Municipal Judges Karolina Tierney and Colleen Herrington,

(together, "Defendants") alleging Defendants committed constitutional violations

when they banned Plaintiffs from submitting bail bonds in their court until Looney

agreed to withdraw a judicial ethics complaint filed against Judge Tierney.  (Doc.

1.)  In October 2024, a stipulated preliminary injunction was entered permitting

Plaintiffs to file bonds in the Bozeman Municipal Court subject to specific

conditions.  (Doc. 28.)  Plaintiffs then amended their complaint, alleging violations

of Plaintiffs' federal constitutional First Amendment right to free speech and to

petition the government for a redress of grievances, (Doc. 32 at ¶¶ 103–23), and

Fourteenth Amendment right to procedural due process, (*id.* at ¶¶ 124–41);

violations of Plaintiffs' Montana state constitutional right to free speech, (*id.* at

¶¶ 142–54), right to procedural due process, (*id.* ¶¶ 155–64), and right to issue bail

bonds as qualified agents of sureties, (*id.* ¶¶ 165–74); and a Montana state-law

claim for tortious interference with Plaintiffs' prospective economic advantage, (*id.*

¶¶ 175–80).  Plaintiffs seek declaratory relief and damages.  (*Id.* at 35.)

Now, Defendants move to dismiss for failure to state a claim.  (Doc. 35.)

They have also notified the Court that they have withdrawn part of their motion to

strike Plaintiffs' motion for leave to file four documents under seal, (Doc. 30), and

their motion to strike paragraphs from the Amended Complaint, (Doc. 37).  (Doc.

43.)

## BACKGROUND

### I.   Factual Background

The allegations in Plaintiffs' Amended Complaint are assumed to be true

and construed in their favor.  *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107,

1114 (9th Cir. 2021).[1]

---

[1] Submissions beyond the pleadings have been filed, which are not considered here
in evaluation of the pending Rule 12(b)(6) motion.  *See Lee v. City of Los Angeles*,
250 F.3d 668, 688 (9th Cir. 2001).

In 2022, John J. Looney, Sr., purchased the right to use the name "Bad Boy Bail Bonds & Shot Gun Willy's Fugitive Recovery Service," from John Jay Willoughby. (Doc. 32 at ¶ 42.) Looney then re-registered the name with the Montana Secretary of State, (*id.* ¶ 43), and he is now the sole owner of Do Process, Inc., d/b/a Bad Boy Bail Bonds ("Bad Boy"), a surety bail bonds business registered as a Montana corporation licensed by Montana's Commissioner of Securities and Insurance (the "Commissioner"), (*id.* ¶¶ 27–30). Looney previously served in the U.S. Army and later became a police officer, detention officer for the Lewis and Clark County Sheriff's Office, and clerk in the Lewis and Clark Justice Court. (*Id.* ¶¶ 32–34.) In addition to owning Bad Boy, Looney now serves as the President of the Montana Bail Agents Association. (*Id.* ¶ 41.)

In 2020, before Looney had purchased the right to use the name, Bad Boy executed a bail bond for $1,585 on behalf of Richard Harmon ("Harmon bond"), a criminal defendant charged with several misdemeanors in Bozeman Municipal Court. (*Id.* ¶ 44.) After Harmon failed to appear, the Bozeman Municipal Court clerk issued a notice of bond forfeiture on February 21, 2020. (*Id.* ¶ 45.)

Over four years later, the Bozeman Municipal Court sought payment of the Harmon bond from Looney. (*Id.* ¶¶ 4, 46.) On January 30, 2024, Michelle Westberg, the Chief Clerk for the Bozeman Municipal Court, sent an email to

Looney stating that he was required to pay the Harmon bond forfeiture or the matter would be submitted to the Commissioner. (*Id.* ¶ 47.)

At a forfeiture hearing before Judge Tierney on March 8, 2024, Looney explained that Bad Boy was not the proper company to pay the forfeiture because the court incorrectly applied the bond to multiple cases, and the bond was executed by Bad Boy before it belonged to Looney. (*Id.* ¶ 48.) Rejecting these arguments, Judge Tierney ordered Bad Boy to pay the Harmon bond. (*Id.* ¶ 49.) On March 14, 2024, Looney filed a notice of appeal, (*id.* ¶ 50), and Judge Tierney issued an order *nunc pro tunc* the following day purporting to remove Looney's notice of appeal from the docket, (*id.* ¶ 51). On March 28, Clerk Westberg filed a complaint against Looney with the Commissioner. (*Id.* ¶ 52.) The Commissioner investigated and, in June 2024, closed the matter. (*Id.* ¶ 53.)

Clerk Westberg then emailed Sergeant Michael Flohr, booking sergeant for the Gallatin County Detention Center in Bozeman, stating that the "Bozeman Municipal Court will no longer accept bail bonds from" Bad Boy "[d]ue to an ongoing, unsettled case in which Bad Boy Bail Bonds owes the Court $1585.00 for a Bond Forfeiture." (*Id.* ¶¶ 54–55.) Defendants were copied on this email. (*Id.* ¶ 56.) The Municipal Court did not give Plaintiffs notice that it had suspended their bail bonding privileges. (*Id.* ¶ 57.) Looney first learned of this suspension on June 30, 2024, when Jennifer Lokken-Ore, one of Looney's Bozeman-based bondsmen,

attempted to post a bond. (*Id.* ¶ 58.) Sergeant Flohr also forwarded a Bad Boy employee the email he had received from Clerk Westberg. (*Id.* ¶ 59.)

In response, Looney filed a complaint with the Montana Judicial Standards Commission against Judge Tierney on July 9, 2024. (*Id.* ¶ 60.) The next day, Looney emailed the Municipal Court advising that he had filed the complaint, and Clerk Westberg forwarded the email to Defendants. (*Id.* ¶¶ 61–62.)

On August 15, 2024, the Municipal Court informed the Yellowstone County Detention Facility that the court would not accept Bad Boy bonds. (*Id.* ¶ 63.) Looney filed a public records request with the City of Bozeman on August 20, 2024, seeking information on the Municipal Court's actions. (*Id.* ¶ 64.) On August 26, 2024, the Commission directed Judge Tierney to respond to Looney's complaint by September 26, 2024. (*Id.* ¶ 65.)

On August 30, 2024, Looney "reluctantly" paid the bond forfeiture to "mitigate mounting financial losses." (*Id.* ¶ 10.) Lokken-Ore brought the check to the court on behalf of Bad Boy. (*Id.* ¶ 67.) Upon acceptance of the check, the court clerks expressed confusion as to why Bad Boy was paying forfeiture on a bond it did not write but stated that they would notify the Gallatin County Detention Center that Bad Boy Bail Bonds was "back in compliance." (*Id.*)

That day, Looney also texted Sergeant Flohr to confirm that Gallatin would resume accepting his bonds in Municipal Court cases. (*Id.* ¶ 68.) Sergeant Flohr

responded that he had not heard anything, (*id.* ¶ 69), and, on September 3, emailed Clerk Westberg to confirm that the Municipal Court would accept Bad Boy bonds, (*id.* ¶ 70). Clerk Westberg responded, "[t]hey did pay the bond – however, that is not the reason that their bonds are not being accepted. Until the judges say otherwise, their bonds are still not to be accepted," (*id.* ¶ 71 (emphasis omitted)), and forwarded the email to Defendants, (*id.* ¶ 72). Sergeant Flohr texted Looney informing him of the Municipal Court's response. (*Id.* ¶ 73.) Looney immediately called Clerk Westberg to inquire when the Municipal Court would allow Bad Boy to issue bonds in its cases. (*Id.* ¶ 74.) Clerk Westberg informed Looney that Defendants required a meeting with him before accepting his bonds and said that she would schedule a meeting. (*Id.* ¶ 75.) She did not call Looney back. (*Id.* ¶ 80.)

Minutes after receipt of Clerk Westberg's email, Looney called Sergeant Flohr, who stated that the Municipal Court's action regarding Bad Boy bonds was "all a bunch of BS[,]" "the jail is getting too full to keep this up[,]" and that Plaintiffs "are normally the only ones bonding people out." (*Id.* ¶ 76.) Sergeant Flohr again emailed Clerk Westberg asking why the court would not allow him to accept Bad Boy bonds, (*id.* ¶ 77), and she responded that the judges wanted to have a meeting with Looney, (*id.* ¶ 78). Looney followed up with Sergeant Flohr later

that day and was informed that Sergeant Flohr had not received any further

messages from the Municipal Court regarding Bad Boy bonds. (*Id.* ¶ 79.)

The next day, September 4, Clerk Westberg emailed Looney stating,

> Regarding the meeting request, the judges are confused as to whether this payment means that the ethics complaint filed against Judge Tierney is resolved and will be withdrawn. With the pending complaint and potential litigation you have referenced, the judges would not be able to meet with you to discuss anything that may be handled pursuant to the complaint or pending litigation. If you can let me know this information to clear up any confusion, I will bring it back to the judges to determine if I can schedule a meeting with you.

(*Id.* ¶ 81 (emphasis omitted).) Looney viewed this email "as a demand by"

Defendants "to withdraw his [Commission] complaint against Judge Tierney in

exchange for his bail bonds being accepted again by them." (*Id.* ¶ 82.) Looney

responded by email stating that he found it

> Concerning that the court's decision to reinstate my bonding privileges is now being tied to the status of the ethics complaint I filed against Judge Tierney. The implication that my business will continue to face penalties unless I withdraw the ethics complaint is troubling . . . [and] gives the appearance that the court is exerting undue pressure on me to withdraw the complaint.

(*Id.* ¶ 83.) Looney did not receive a response to this email. (*Id.* ¶ 84.)

Over the next nine days, Looney sent daily emails to the Municipal Court

stating that he had paid the bond forfeiture and emphasizing the harm caused to his

business by Defendants' actions. (*Id.* ¶ 17.) In one email he stated that his "ability

to write bonds should not be contingent upon the outcome of that complaint, which

is now in the hands of the Commission." (*Id.* ¶ 85 (emphasis omitted).) On

September 9, 2024, Looney emailed Defendants directly, copying Clerk Westberg,

stating,

> Shortly after my company made the payment, I reached out to Michelle
> Westberg to confirm whether my business could resume bonding
> activities. She informed me that both of you wished to meet with me
> before restoring my bonding privileges. However, on September 4,
> 2024, Ms. Westberg notified me via email that neither of you were
> willing to meet while my Judicial Standards Commission (JSC)
> complaint against Judge Tierney remains pending. While I respect your
> decision regarding whether to meet, I would like to clarify that the
> reinstatement of my company's bonding privileges should not depend
> on the outcome of such a meeting or whether it occurs at all. To the best
> of my knowledge, there is no legal basis for denying my company's
> right to resume bonding activities in your court . . . [T]he ability to write
> bonds in Bozeman is crucial to sustaining our business. We typically
> write between $250,000 and $350,000 per month in liability. By
> restricting our ability to operate in Municipal Court, we are
> significantly limited in our capacity to provide services in other courts.
> Additionally, when clients are arrested on new charges or warrants in
> other courts but also have pending charges in Municipal Court, we are
> unable to provide full assistance and are forced to refer them to our
> competitors for their Municipal Court bond. This situation is not only
> harming our business operations but is also impacting our reputation in
> the community.

(*Id.* ¶ 87 (emphasis omitted).)

Looney did not receive a response, (*id.* ¶ 88), and he sent another email to

Defendants the next day reiterating that Defendants' ban was causing significant

harm to the Bad Boy business and its reputation in the community as well as the

value of the business that he was losing as a result of Defendants' retaliation

against him for refusing to withdraw his Commission complaint. (*Id.* ¶ 89.) He

further stated that "the lack of communication and response from the court is not only affecting my business but is also inconsistent with fair and transparent judicial processes." (*Id.*)  Again, Looney did not receive a response. (*Id.* ¶ 90.)  Looney then emailed Defendants directly two more times over the next two days. (*Id.* ¶¶ 91–93.)

On September 13, 2024, Defendant Judge Herrington responded to Looney in the following email:

> At this time, there is a pending ethics complaint with the Commission on Judicial Standards and you have stated in an email to Ms. Westberg that you have also filed new complaints. Additionally, you have indicated in several different communications that there is pending litigation against the City of Bozeman and/or the Bozeman Municipal Court. Until there are decisions by the Commission on Judicial Standards and/or until any litigation is complete, we are unable to discuss any topics concerning Bad Boy Bail Bond and/or Montana Pretrial Services, LLC with you directly. Ms. Westberg has already communicated this to you.

(*Id.* ¶ 94.)

Looney immediately responded, copying Judge Tierney and Clerk Westberg, stating,

> I must express my deep concern over the court's continued suspension of my company's bonding privileges. While it is true that I have filed an ethics complaint with the Commission on Judicial Standards [and] I will be filing more against you and Judge Tierney, I want to make it unequivocally clear: there is no pending litigation against the City of Bozeman or the Bozeman Municipal Court. Any suggestion otherwise is either a misunderstanding or a mischaracterization of my prior communications. Filing a FOIA request or submitting an ethics complaint does not in any way amount to active litigation, nor does it

provide legal grounds to suspend my bonding privileges and severely impact my business. I again respectfully request that you *immediately* reverse your instruction to the detention center and inform them that they may again accept my company's bail bonds.

(*Id.* ¶ 95 (alternations omitted).)  Looney did not receive a response.  (*Id.* ¶ 96.)

On September 30, State Senator Barry Usher, a member of the Senate Select Committee on Judicial Oversight and Reform, called Clerk Westberg to request a copy of the order banning acceptance of Looney's bonds. (*Id.* ¶ 97.)  Clerk Westberg informed Senator Usher that there was no written order regarding Bad Boy bonds, instead, the Municipal Court issued a verbal administrative order banning the bonds, which was transmitted via email to the Gallatin County Detention Center. (*Id.* ¶ 98.)  She also insisted that the administrative order was only transmitted to Gallatin County. (*Id.*)

As a result of this "order," Bad Boy suffered an 85-percent reduction of its Bozeman business. (*Id.* ¶ 100.)  Bad Boy typically wrote bail bonds valued between $250,000 and $350,000 per month for Bozeman Municipal Court cases, which accounted for 50 percent of its business in Montana. (*Id.* ¶ 99.)  Looney struggled to cover operational expenses, including payroll, insurance, and the maintenance of pretrial services programs. (*Id.* ¶ 101.)  The loss of Bozeman bonds forced Looney to refer clients to competitors, harming not only his business' revenues but also its reputation: "Bad Boy Bail Bonds had numerous clients turn to

its competitors, compounding its financial losses and further harming its brand."
(*Id.* ¶ 102.)

Looney did not withdraw his complaint against Judge Tierney and filed
another Commission complaint against Judge Tierney, and one against Judge
Herrington. (*Id.* ¶ 20; *see* 43-1, 43-2, 43-3.)  All Judicial Standards Commission
complaints filed by Looney against Judge Tierney and Judge Herrington have been
dismissed.[2] (Docs. 43-1, 43-2, 43-3.)

## II.    Procedural Background

On October 1, 2024, Plaintiffs filed suit under 42 U.S.C. § 1983 against
Defendants alleging violations of Plaintiffs' First Amendment right to petition the
government for a redress of grievances.  (Doc. 1 at ¶¶ 99–122.)  That same day,
Plaintiffs filed a motion for a temporary restraining order and preliminary
injunction.  (Doc. 3.)  While the request for a temporary restraining order was
denied, (*see* Docs. 3, 9), the request for preliminary injunctive relief was set for
hearing, (Doc. 11).  Defendants responded to the motion for preliminary
injunction, (Doc. 14), and filed a motion to dismiss, (Doc. 12).  The parties then
filed a stipulated preliminary injunction and joint motion to vacate the hearing.

---

[2] The grounds of dismissal are not specified.  (*E.g.*, Doc. 43-1 ("This will advise
you that the above matter has been reviewed and dismissed. The Judicial Standards
Commission will take no further action on this complaint.")).

(Doc. 27.)  The Court granted the stipulated preliminary injunction, (Doc. 28), and vacated the hearing, (Doc. 29).

Plaintiffs then amended their complaint to seek damages under the federal constitution for violations of their First Amendment right to free speech and to petition the government for a redress of grievances (Count II), (Doc. 32 at ¶¶ 116–23), and Fourteenth Amendment right to procedural due process (Count IV), (*id.* at ¶¶ 124–41); under the Montana state constitution for violations of the right to free speech (Count V), (*id.* at ¶¶ 142–54), the right to procedural due process (Count VI), (*id.* ¶¶ 155–64), and the right issue bail bonds as qualified agents of sureties (Count VII), (*id.* ¶¶ 165–74); and under Montana state law for tortious interference with Plaintiff's prospective economic advantage (Count VIII), (*id.* ¶¶ 175–80). Plaintiffs also seek declaratory relief for a violation of their First Amendment right to petition the government for a redress of grievances (Count I), (Doc. 32 at ¶¶ 103–15), and their Fourteenth Amendment right to procedural due process (Count III), (*id.* at ¶¶ 124–32).

Defendants move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, (Doc. 35), on the grounds of absolute judicial immunity and the retroactive declaratory relief bar in § 1983.  Defendants had also moved to strike Plaintiffs' Motion for Leave to File Documents Under Seal, (Docs. 19, 30), and paragraphs 8 and 65 of the Amended Complaint, (Docs. 32, 37), however they

have notified the Court of their intent to withdraw part of the first motion, and the second motion in its entirety, (Doc. 43).

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Dismissal is appropriate "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) (internal quotation marks omitted).

## ANALYSIS

Defendants argue that all claims for damages should be dismissed because they are entitled to absolute judicial immunity and all claims for declaratory relief should be dismissed because § 1983 does not provide for retrospective declaratory relief.  (Doc. 36.)  Defendants do not address the merits of the claims against them. For the reasons explained below, Defendants' motion to dismiss is denied.

## I.    Judicial Immunity as to Damages Claims (Counts II, IV–VIII)

Judges are absolutely immune from damages actions for judicial acts taken within the jurisdiction of their courts. *Ashelman v. Pope,* 793 F.2d 1072, 1075 (9th Cir.1986) (en banc). Such judicial immunity extends to § 1983 claims. *Pierson v. Ray*, 386 U.S. 547, 554–55 (1967); *see Stump v. Sparkman*, 435 U.S. 349, 351 (1978); *Mireles v. Waco*, 502 U.S. 9, 9–10 (1991) (per curiam). However, absolute judicial immunity only applies to judicial acts, not to the "administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Forrester v. White*, 484 U.S. 219, 224–29 (1988). Accordingly, the following two exceptions to absolute judicial immunity exist: (1) "nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity," and (2) "actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles*, 502 U.S. at 11–12; *Ashelman*, 793 F.2d at 1075.

Defendants argue that because they are entitled to absolute judicial immunity, all claims for damages against them should be dismissed. Plaintiffs seek damages for every violation alleged, (*see* Counts II, IV–VIII), and argue that Defendants are not entitled to judicial immunity because their action of suspending a licensed bail bondsman's privileges was not a judicial action, and this action was taken in the clear absence jurisdiction because the authority to suspend these privileges resides exclusively with the Montana Commissioner of Securities and Insurance (the "Commissioner").

As a threshold matter, Plaintiffs assert that Defendants bear the burden of establishing that they are entitled to judicial immunity, citing to *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 432 (1993). (Doc. 41 at 8.) Defendants disagree stating that it is a plaintiff's burden to demonstrate that one of the exceptions to absolute judicial immunity applies, citing to *Bloodgood-Loper v. Loper*, 2024 WL 3949082, at *1 (9th Cir. Aug. 27, 2024), as an example. Defendants are correct. The burden is on the Plaintiffs to allege sufficient facts that show Defendants acted "in the clear absence of all jurisdiction or perform[ed] an act that [was] not judicial in nature." *Schucker v. Rockwood*, 846 F.2d 1202, 1204 (9th Cir. 1988); *see Mireles*, 502 U.S. at 11–12 (explaining "[j]udicial immunity is overcome in only two circumstances").

For the reasons explained below, Defendants are not entitled to judicial immunity.

### a. Nonjudicial Action

To determine if a judge's action is judicial in nature, courts consider the following factors: whether "[i] the precise act is a normal judicial function; [ii] the events occurred in the judge's chambers; [iii] the controversy centered around a case then pending before the judge; and [iv] the events at issue arose directly and immediately out of a confrontation with the judge in his or her official capacity." *Meek v. County of Riverside*, 183 F.3d 962, 967 (9th Cir. 1999) (internal quotation

marks omitted); *see Ashelman*, 793 F.2d at 1075–76 (collecting cases); *see also*
*Stump*, 435 U.S. at 362 (explaining that the factors reflect "whether [the act] is a
function normally performed by a judge" and "whether [the parties] dealt with the
judge in his judicial capacity"). While Defendants agree that these factors apply
here, they emphasize that courts should construe them "generously in favor of the
judge and in light of the policies underlying judicial immunity." (Doc. 36 at 12
(citing *Ashelman*, 793 F.2d at 1076).) Even construing the factors generously, as
explained below, the factors weigh in favor of finding Defendants are not entitled
to judicial immunity here.

### i.  A Normal Judicial Function

The first step in determining whether "the precise act is a normal judicial
function," *Meek*, 183 F.3d at 967, is identification of the precise act. Here, the
precise act at issue is Defendants' suspension of Bad Boy's bonding privileges,
which proceeded in two parts: the initial implementation of the suspension and its
continuation following payment of the Harmon bond forfeiture. (*See* Doc. 32 at ¶¶
54–55, 63.) Plaintiffs argue this act is not a normal judicial function because the
suspension of bonding privileges is an administrative act exclusively within the
authority of the Commissioner. (Doc. 41 at 20–22.) Defendants disagree and
categorize Plaintiffs' actions as a "collateral attack," because Looney could have
filed a writ to challenge the decision regarding the Harmon bond or attempted to

bond a different criminal defendant and then filed a writ challenging an adverse decision. (Doc. 36 at 16–17.) Defendants further argue, without citing any authority, that they were permitted to advise detention centers that the Municipal Court was not accepting Plaintiffs' bonds without further notice. (*Id.* at 17.)

Neither Plaintiffs nor Defendants are completely correct. Plaintiffs essentially characterize Defendants' suspension of Bad Boy's bonding privileges as a suspension of Bad Boy's license to issue bonds. Defendants characterize their action somewhat inconsistently as both permitted conduct in connection to bond forfeiture in Harmon's criminal case, (Doc. 36 at 17), and as a discretionary decision "based on a variety of reasons (none of them retaliatory)," (Doc. 44 at 8). However, this precise act is not a suspension of Bad Boy's license to bond, an action taken in direct connection to Harmon's criminal case, or a permitted discretionary decision. Instead, Defendants suspended Bad Boy's bonding privileges in their court, and maintained that suspension after the disputed Harmon bond forfeiture was paid because of the pending Commission complaint against Judge Tierney. (Doc. 32 at ¶ 71 (Looney "did pay the bond – however, that is not the reason their bonds are not being accepted."); ¶ 81 ("[T]he judges are confused as to whether this payment [of the Harmon bond forfeiture] means that the ethics complaint filed against Judge Tierney is resolved.")) Such actions are properly characterized as a nonjudicial function.

Montana law and the Montana Supreme Court's decision in *Wilshire Insurance Co. v. Carrington*, 570 P.2d 301 (Mont. 1977), show that the precise act at issue here was not a normal judicial function. Montana law grants the Commissioner the authority to suspend bonding licenses. Mont. Code Ann. § 33-17-1001 ("The commissioner may suspend, revoke, refuse to renew, or refuse to issue a [bonding] license."). This section of the Montana Code does not address the suspension of bonding privileges, as opposed to the suspension of a bonding license. Determining whether suspension of bonding privileges in a specific court is tantamount to suspending a surety's bonding license is not necessary at this stage because Montana law does specify how a "court having jurisdiction shall proceed" "[w]hen an order of [bond] forfeiture is not discharged," which does not include suspending all bonds from a specific commercial surety company. *See* Mont. Code Ann. § 46-9-511. Instead, Montana law provides:

> Forfeiture procedure.
>
> (1) When an order of forfeiture is not discharged, the court having jurisdiction shall proceed with the forfeiture of bail as follows:
>
> (a) if money has been posted as bail in a misdemeanor case, as defined in 45-2-101, the court shall pay the money to the treasury of the city or county where the money was posted;
>
> (b) if money has been posted as bail in a felony case, as defined in 45-2-101, the court shall pay the money to the department of revenue for deposit in the state general fund; or

(c) if other property is posted as a condition of release, the property must be sold in the same manner as property sold in civil actions. The proceeds of the sale must be used to satisfy all court costs and prior encumbrances, if any, and from the balance, a sufficient sum to satisfy the judgment or forfeiture must be paid as provided under subsection (1)(a) in a misdemeanor case or under subsection (1)(b) in a felony case.

(2) If a surety bond has been posted as bail, execution may be issued against the sureties or the surety company in the same manner as executions in civil actions.

*Id.* "[A] procedure for forfeiture and enforcement [of bonds] mandated by statute is exclusive and must be followed." *Wilshire*, 570 P.2d at 303. Thus, pursuant to this statutory mandate, a normal judicial act for Defendants to have taken against Bad Boy under the circumstances would have been execution against it in the same manner as an execution in a civil action. *See id.*; Mont. Code Ann. § 46-9-511.

Though Defendants are correct that *Wilshire* does not require courts to accept defective bonds, it clarifies that if sureties are "in compliance with the pertinent provisions of law and [] authorized to do business as commercial sureties in the state of Montana[,]" then the bonds they issue "should be approved in all similar cases." 570 P.2d at 304. While Defendants argue that they suspended Bad Boy's bonding privileges for a "variety of reasons (none retaliatory)," (Doc. 44 at 8), they do not assert that Bad Boy failed to comply with Montana law nor that it was unauthorized to do business as a commercial surety in Montana. Indeed, their stipulation regarding preliminary relief requires Plaintiffs to comply with local and

state rules—not state law—indicating any putative violations by Bad Boy are of rules, not law. (*See* Doc. 36 at 18–19; Doc. 28.) Significantly, in *Wilshire*, the surety never made payment on the forfeited bonds at issue, and nonetheless, the Montana Supreme Court held the court's "refusal to accept [the surety's] bonds was in error" and "[s]uch bonds should be approved in all similar case." 570 P.2d at 304. Ultimately, consistent with *Wilshire*, because Bad Boy was apparently in compliance with Montana law and authorized to conduct business as a commercial surety, it was not a normal judicial function to suspend its bonding privileges.

In the absence of binding authority on point, both parties then turn to *American Druggists Insurance Co. v. Bogart*, 707 F.2d 1229 (11th Cir. 1983), to support their respective argument as to this factor. In *Bogart*, a licensed corporate surety was placed on a list of disqualified sureties by the United States District Court for the Southern District of Florida because of an unpaid forfeiture amount. *Id.* at 1230. Upon disqualification, the clerk of court mailed a form letter to the surety providing it twenty days to pay the outstanding amount of the bond in full or be disqualified, which meant the surety would be precluded from writing any further bonds until the amount had been satisfied. *Id.* at 1231. The Eleventh Circuit, reversing the district court's actions, determined that the court "fail[ed] to comply with even the minimum standards of due process," *id.* at 1237, and that "[a]lthough the court always retains the discretion to create appropriate bail and

bond conditions with respect to particular criminal defendants, the regulation of

corporate sureties is basically an administrative function," *id.* at 1234. The Circuit

also determined that the clerk's form letter sent to the disqualified surety did not

indicate that "the surety may appeal directly to the court for approval of an

individual bond despite its status on the disqualification list[,]" which "suggests

that the court may be overstepping its bounds." *Id.*

 While many aspects of this case are distinguishable from the facts at issue

here, the following two are the most important. First, *Bogart* addressed a federal

court's policy regarding bail bonding, which required examination of federal law.

*Id.* at 1231–32. Analogizing federal law to Montana law can be helpful for

framing the issue but is not on point in this case. Second, in *Bogart*, once the full

amount of the bond was paid, the district court removed the surety from its

disqualification list, whereas here, Looney paid the disputed Harmon bond, yet the

Defendants maintained the suspension of Bad Boy's bonding privileges. (Doc. 32

at ¶ 71 ("They did pay the bond – however, that is not the reason that their bonds

are not being accepted. Until the judges say otherwise, their bonds are still not to

be accepted.").) This continued suspension after payment indicates that

Defendants were attempting to "regulat[e] [a] corporate suret[y,]" which "is

basically an administrative function." *See Bogart*, 707 F.2d at 1234. Indeed, the

Municipal Court itself categorized the suspension as a verbal "administrative

order" suspending the bonds. (Doc. 32 at ¶ 98). And, not only did Defendants fail to notify Plaintiffs of the suspension of their bonding privileges, but also proactively removed Plaintiffs' notice of appeal from the case file. (*See id.* ¶¶ 5, 51, 57–58.)

Having considered the arguments of the parties and the governing law, this factor weighs in favor of finding that the act at issue was not a judicial action.

### ii. Events Occurred in Judge's Chambers

Plaintiffs argue that Defendants did not memorialize their suspension in a written order, and it is undisputed that the Municipal Court was not in session at the time the directive was given. Defendants assert that the events occurred in the Judges' chambers. They define the events as the Harmon ruling and the "decisions related to Plaintiffs' ongoing poor conduct." (Doc. 36 at 17.) It is unclear from the record whether the decision and implementation of the suspension of Bad Boy bonds took place in either Judge's chambers. However, the events did not occur while the court was in session nor was the decision effectuated by written court order. *Compare with Lund v. Cowan*, 5 F.4th 964, 972 (9th Cir. 2021) (comments were made "from the bench during an official settlement approval hearing in a probate case"). Accordingly, while a closer call, this factor weighs in favor of finding that the act at issue was not a judicial action. *See Meek*, 183 F.3d at 967–

68 (accepting the district court's cast of similar facts as weighing against a finding of judicial action).

### iii. Controversy Centered Around a Case Pending Before the Judge

Plaintiffs argue that Defendants' suspension of Bad Boy's bonding privileges was not centered around a pending case for two reasons. First, in March 2024, Judge Tierney ordered Looney to pay the outstanding amount for the Harmon bond forfeiture, and then removed his notice of appeal from the docket. Thus, the Harmon case was no longer pending before Judge Tierney when she implemented the Bad Boy bond suspension in June 2024. Second, "the suspension was not tied to any specific case but instead constituted an indefinite general policy." (Doc. 41 at 24.) On the other hand, Defendants argue that Judge Tierney's decision regarding bond forfeiture was made in connection with the Harmon case because "[t]he issues in Plaintiffs' Complaint all started with the Harmon Matter. From there, Plaintiffs refused to pay the forfeiture. This was a case that was unquestionably in front of Judge Tierney." (Doc. 44 at 10–11.) Plaintiffs have the better argument.

"[T]he 'touchstone' for the doctrine[] [of judicial immunity's] applicability has been 'performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights.'" *Antoine*, 508 U.S. at 435 (quoting *Burns v. Reed*, 500 U.S. 478, 500 (1991) (Scalia, J., concurring)). "It is the nature

of the function performed—adjudication—rather than the identity of the actor who performed it—a judge—that determines whether absolute immunity attaches to the act." *Forrester*, 484 U.S. at 219–20.

Bad Boy's bonding privileges were suspended in June 2024, and Looney paid the disputed bond amount in August 2024. Thus, the decision to initiate the suspension could reasonably be tied to the Harmon matter. *See Antoine*, 508 U.S. at 435. Following payment, however, Defendants did not lift the suspension. As discussed above, Montana law does not imbue judges with the authority to suspend bonding privileges of a surety that is licensed and comporting with state law. *Wilshire*, 570 P.2d at 304. Accordingly, this factor weighs in favor of finding that that the act at issue was not a judicial action.

### iv. Events at Issue Arose Directly and Immediately Out of a Confrontation with the Judge in His or Her Official Capacity

Plaintiffs argue that the events did not arise directly or immediately out of a confrontation with Defendants in their official capacities for two reasons. First, timing. Plaintiffs assert that Judge Tierney provided Looney with one week to pay the Harmon bond forfeiture in March 2024 and he failed to pay within that time, yet Defendants did not implement the suspension of Bad Boy's bonding privileges until June 2024. (Doc. 41 at 20.) Thus, Plaintiffs argue that this act cannot have immediately arisen out of any confrontation between the parties. (*Id.*) Second,

Plaintiffs argue that the Municipal Court filed a complaint with the Commissioner regarding Bad Boy, which the Commissioner closed on June 6, 2024. (*Id.*) Only after that closure did Defendants implement the suspension. (*Id.*) Thus, Plaintiffs argue that the suspension did not directly arise from the Harmon bond forfeiture, and instead stemmed from Defendants dissatisfaction with the Commissioner's June 2024 decision. (*Id.* at 20–21.) On the other hand, Defendants argue that the events at issue arose directly and immediately out of the decisions they made in their official capacities. Specifically, Defendants assert that Judge Tierney ordered bond forfeiture and, only when Plaintiffs failed to pay in that case, Defendants made the determination not to allow Plaintiffs to write further bonds. (Doc. 36 at 18.) Ultimately, neither party is correct.

Defendants are correct that this factor does not require the events to arise out of the Harmon matter but instead only requires that the events arise out of a confrontation with Defendants in their official capacity. Here, as explained above in factor (iii), the initial suspension of Bad Boy's bonding privileges could reasonably be tied to the Harmon matter, thus possibly attributable to a confrontation with Judge Tierney in her official capacity. However, there are various acts that comprise the suspension: Judge Tierney ordered the forfeiture of the Harmon bond, the Municipal Court filed a complaint with the Commissioner regarding Bad Boy, Looney filed a complaint with the Montana Judicial Standards

Commission, the Commissioner dismissed the Court's Complaint, and then both Judges made the determination not to allow Plaintiffs to write further bonds despite Looney making payment. This factor is, accordingly, neutral because it is unclear from the record from which "confrontation" the suspension arose.

### v.  Conclusion

On balance, these factors show that the suspension of Bad Boy's bonding privileges was not a judicial act, and, accordingly, Defendants are not entitled to absolute judicial immunity.

### b.  Complete Absence of All Jurisdiction

A judge acts in the complete absence of all jurisdiction, specifically subject matter jurisdiction, "when a judge knows that [s]he lacks jurisdiction, or acts in the face of clearly valid statutes or case law expressly depriving h[er] of jurisdiction." *Rankin v. Howard*, 633 F.2d 844, 849 (9th Cir. 1980), *overruled on other grounds by Ashelman,* 793 F.2d 1072; *see Ashelman*, 793 F.2d at 1076. Plaintiffs argue that Defendants acted in the clear absence of jurisdiction by usurping a function that state law assigns to the Commissioner. Specifically, Plaintiffs assert that Montana law explicitly grants the Commissioner the sole authority to suspend bonding licenses, Mont. Code Ann. § 33-17-1001, and expressly prohibits judges from refusing bonds issued by licensed bondsmen, *Wilshire*, 570 P.2d at 304. (Doc. 41 at 10.) Defendants argue that they have subject matter jurisdiction over bonding

privileges in Municipal Court because they have the power to establish a schedule

of bail, Mont. Code Ann. §§ 3-1-111 to −113, set bonding conditions, Mont. Code

Ann. §§ 46-9-302, -311(1), and make rules for the their court's governance, Mont.

Code Ann. § 3-1-112, as well as the power to provide for the orderly conduct of

proceedings, compel obedience to judgements, and amend and control their court's

process and orders, Mont. Code Ann. § 3-1-111, with the means to carry that

jurisdiction to effect, Mont. Code Ann. § 3-1-113.  (Doc. 36 at 19.)  Further,

Defendants argue that the specific restrictions the state legislature has placed on

judicial officers do not include limiting their discretion over whether to accept a

bond. *See* Mont. Code Ann.  §§ 3-1-601 to 608.  For the reasons discussed below,

Plaintiffs are correct.

### i. Acting in the Face of Clearly Valid Statutes or Caselaw that Deprives the Judge of Jurisdiction

By suspending Bad Boy's bonding privileges Defendants are acting in the

face of both clearly valid statutes and caselaw that deprive them of jurisdiction.  In

*Stump v. Sparkman*, a seminal Supreme Court case discussing judicial immunity, a

crucial issue was whether a judge had acted within his jurisdiction in approving a

mother's petition to have a tubal ligation operation performed on her minor

daughter without her daughter's knowledge or consent.  435 U.S. at 355.  In

assessment of whether the judge acted in clear absence of all jurisdiction, the

Supreme Court evaluated caselaw and the relevant state statutes' grant or

**Page 27 of 40**

prohibition of jurisdiction. *Id.* at 357–58. Essentially, the Court inquired into whether caselaw or state statutes have "circumscribed to foreclose" the jurisdiction of a court over the act at issue. *Id.* at 358.

Applying *Stump* here, Montana law and caselaw foreclose Defendants' jurisdiction over the suspension of a licensed surety's bonding privileges. Montana law authorizes judges to establish "a schedule of bail for offenses over which the judge has original jurisdiction," Mont. Code Ann. § 46-9-302, which would entail setting the monetary amount for certain offenses specifically over which the judge has original jurisdiction. Under *Stump*, this statute alone is not sufficient to foreclose Defendants' jurisdiction, 435 U.S. at 359–60 (explaining the lack of a specific statute authorizing a judge's action does not foreclose his jurisdiction over that action). However, Montana law expressly mandates a court's actions "[w]hen an order of forfeiture is not discharged," Mont. Code Ann. § 46-9-511, which, as discussed above, does not include the suspension of a surety's bonding privileges, and, instead, states that "execution may be issued against . . . the surety company in the same manner as execution in civil actions." *Id.*

Regarding the right to make rules for the Municipal Court's governance, state law provides that "[e]very court of record may make rules, not inconsistent with the laws of this state," Mont. Code Ann. § 3-1-112, which means Defendants

must still comply with state laws governing bail bonds.  More narrowly even, the "[p]owers respecting conduct of business," give every court the power to "compel obedience to its judgment, orders, and process," Mont. Code Ann. § 3-1-111(4), but the directive at issue in this case was not a judgment, order, or process—it was an email.

As to the Commissioner and citizens, Montana law empowers the Commissioner to "suspend, revoke, refuse to renew, or refuse to issue a license," Mont. Code Ann. § 3-17-1001, and the Montana Constitution guarantees that "[a]ll persons shall be bailable by sufficient sureties, except for capital offenses, when the proof is evident or the presumption great." Mont. Const., art. III, § 21.

None of Defendants' arguments successfully rebuff the above reading of the law.  The Montana laws that place restrictions on judicial officers are limited as Defendants argue, but such statutes are irrelevant here.  *See* §§ 3-1-601 to 608. These sections of the Montana Code Annotated largely prohibit sitting judges from practicing law, administering estates, or holding a political office.  *See id.*  The specific section that places "restrictions on municipal court judges" states "[a] municipal court judge may not practice law before the judge's own municipal court or hold office in a political party during the judge's term of office."  Mont. Code Ann. § 3-1-604.  Defendants' reliance on a 2002 Montana Attorney General's Opinion is also misplaced.  (*See* Doc. 36 at 16–17.)  That opinion addresses

"[w]hether the Montana Constitution and Montana law authorize a municipal court judge to release a defendant on a time-pay bail bond, defined as a bond in an amount set by the judge to be paid in installments." (*See* Doc. 36-2.) Setting the payment parameters of a single bond as to a specific criminal defendant in a case before a judge is distinct from a judge issuing a ban on all bail bonds written by a specific commercial surety company.

Lastly, both parties argue that *Wilshire*, which was discussed above in the context of the first factor, supports their argument. In *Wilshire*, a corporation authorized by the Commissioner to do business in Montana as a commercial surety supplied bail bonds for two criminal defendants who failed to appear before a Missoula County Justice of the Peace. 570 P.2d at 302. After no payment was made, the Justice entered an order directing the sheriff to accept no further bonds from the surety. *Id.* At the time the case reached the Montana Supreme Court, the forfeited bonds were still outstanding. *Id.* As discussed above, the Montana Supreme Court held the court's "refusal to accept [the surety's] bonds was in error" and "[s]uch bonds should be approved in all similar case." *Id.* at 304.

Defendants argue that *Wilshire* supports that courts do have jurisdiction to consider whether bonds are sufficient, and to reject defective bonds. Plaintiffs argue that though courts are not required to accept defective bonds, the bonds issued by sureties "in compliance with the pertinent provisions of law and []

authorized to do business as commercial sureties in the state of Montana[,]"
"should be approved." 570 P.2d at 304. The holding in *Wilshire* thus supports
Plaintiffs' argument.

Ultimately, when the Montana Constitution, state law, and caselaw are read
together, Montana law establishes that a judge does not have jurisdiction to
suspend a licensed surety's bonding privileges. Accordingly, judicial immunity is
lost.

### ii.  Knowledge that the Judge Lacks Jurisdiction

As the record stands, Defendants appear to recognize their lack of
jurisdiction over the suspension at issue. Defendants assert that since the
Commissioner "appears to have dismissed the Judges' complaint . . . the
Commissioner has apparently abdicated jurisdiction under the circumstances."
(Doc. 44 at 7.) With this statement, Defendants seem to concede that the
Commissioner does have jurisdiction over the suspension issue, as the
Commissioner could not abdicate jurisdiction that it never possessed. Further,
Defendants submitted a complaint to the Commissioner in April 2024, (Doc. 32 at
¶ 52), which again indicates knowledge that the Commissioner has jurisdiction
over this issue.

Accordingly, since the current record demonstrates that Defendants knew the Commissioner—not the Municipal Court—has jurisdiction over such a suspension, Defendants are not entitled to judicial immunity.

### c. Conclusion

For the reasons states above, because Defendants are not entitled to judicial immunity, their motion to dismiss Plaintiffs' damages claims is denied.

## II.    Retroactive Declaratory Relief Bar under § 1983

Plaintiffs seek declaratory relief for a violation of their First Amendment right to petition the government for a redress of grievances (Count I), (Doc. 32 at ¶¶ 103–15), and their Fourteenth Amendment right to procedural due process (Count III), (*id.* at ¶¶ 124–32).  Defendants argue that since § 1983 bars retrospective declaratory relief, Plaintiffs' claims for declaratory relief should be dismissed.  Defendants specifically rely on Eighth and Tenth Circuit decisions that determine claims of retrospective declaratory relief are not cognizable under § 1983.  (Doc. 36 at 21 (citing to *Justice Network Inc. v. Craighead Cty.*, 931 F.3d 753, 763-64 (8th Cir. 2019); *Lawrence v. Kuenhold*, 271 F. App'x 763, 766 (10th Cir. 2008)).)  Defendants argue that although Plaintiffs present their request as one for future relief, in actuality that relief would be retroactive because it would address Defendants' past decisions regarding Bad Boy's bonding privileges.  Defendants also emphasize that Plaintiffs are now writing bonds again.  Relying on

the Seventh Circuit decision in *Lawrence v. Kuenhold*, Defendants further assert

that declaratory relief is inappropriate here because Plaintiffs have an alternative

avenue for redress, which would consist of filing a writ in the Harmon matter, or in

any other matter in which Bad Boy was prohibited from writing a bond. *See* 271

F. App'x 763 (10th Cir. 2008).

Plaintiffs argue that because "they challenge the Judges' ongoing conduct

and policies[,]" the relief sought is "inherently prospective." (Doc. 41 at 27.)

They assert that the Ninth Circuit has rejected attempts to avoid prospective relief

when government actions suggest the possibility of renewed unconstitutional

conduct. (*Id.* (citing *Jacobus v. Alaska*, 338 F.3d 1095, 1105 (9th Cir. 2003), *rev'd*

*on other grounds, Board of Trustees of Glazing Health and Welfare Trust v.*

*Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019)).) Ultimately, Plaintiffs are

correct.

"[I]n any action brought against a judicial officer for an act or omission

taken in such officer's judicial capacity, injunctive relief shall not be granted

unless a declaratory decree was violated or declaratory relief was unavailable." 42

U.S.C. § 1983. This language was added to the statute as part of the Federal

Courts Improvement Act. Most courts hold that prospective declaratory relief is

still available under § 1983. *Lund*, 5 F.4th at 970 n.2 (citing *Justice Network, Inc.,*

*v. Craighead County*, 931 F.3d 753, 763 (8th Cir. 2019) ("Currently, most courts

hold that the amendment to § 1983 does not bar declaratory relief against judges.")).  However, the Ninth Circuit has yet to decide whether claims for declaratory relief may be brought under § 1983.  *Id.*  ("Our court has not yet explicitly answered whether the statutory amendment bars declaratory relief . . . . But we leave that question for another day.").

In their Amended Complaint, Plaintiffs seek "prospective declaratory relief affirming" their "right issue bail bonds while engaging in protected speech" (Doc. 32 at ¶ 115), and "right to notice and hearing before [their] right to issue bail bonds can be suspended[,]" (*Id.* ¶ 132).  Consistent with the majority approach to declaratory relief under § 1983, *see Lund*, 5 F.4th at 970 n.2, Plaintiffs' requests for prospective relief is permitted to proceed as discussed below.

### a.  Prospective or Retroactive Relief

The parties disagree whether the declaratory relief sought is retroactive or prospective.  Defendants argue the former, and Plaintiffs the latter.  Despite Plaintiffs' attempt to analogize this inquiry to that of mootness, which is not relevant here, *see Renne v. Geary*, 501 U.S. 312, 316 (1991) (explaining that mootness "go[es] to the power of the federal courts to entertain disputes"), Plaintiffs have the better argument.

Defendants unpersuasively argue that *Phillips v. Henderson*, a District of Nevada case, is dispositive as to this issue.  2024 WL 4267821, *15 (D. Nev. Sept.

22, 2024). In *Phillips*, plaintiff sought a declaration that a judge's signed order allowing media presence during a family-court proceeding violated his due process rights from the date of its issue. *Id.* at *1, 6. The district court found that this claim for declaratory relief was not cognizable under § 1983 because plaintiff sought retrospective relief. *Id.* at *6. Here, however, Plaintiffs seek affirmation of their "right to issue bail bonds while engaging in protected speech" (Doc. 32 at ¶ 115), and their "right to notice and hearing before [their] right to issue bail bonds can be suspended[,]" (*Id.* ¶ 132). Unlike the backward-looking relief sought in *Phillips*, Plaintiffs are looking to their future ability to issue bonds. Further, Defendants' suspension of Bad Boy's bonding privileges was ongoing when Plaintiffs filed this action, and only ceased following the entry of a stipulated preliminary injunction on October 24, 2024, (*see* Docs. 1, 28, 32), and Plaintiffs assert that Defendants' conduct is actually "ongoing," (Doc. 41 at 27). Thus, Plaintiffs' declaratory relief is not necessarily limited to past actions of Defendants so as to render it retroactive.

Though most courts hold prospective declaratory relief is available under § 1983, *Lund*, 5 F.4th at 970 n.2 (citing *Justice Network*, 931 F.3d at 763), to obtain this remedy Plaintiffs must still demonstrate that the likelihood of future injury is not speculative, *see Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1044 (9th Cir. 1999) (explaining "the ripeness requirement serves the same function in

limiting declaratory relief as the imminent-harm requirement serves in limiting injunctive relief"). Plaintiffs have sufficiently alleged such a likelihood through their explanation that writing bonds in Bozeman Municipal Court constitutes approximately 50 percent of Bad Boy's business in Montana, (Doc. 32 at ¶ 99), and Defendants did not reinstate Bad Boy's bonding privileges once the Harmon bond forfeiture was paid, (*id.* ¶ 70).

Accordingly, Plaintiffs have properly pled a request for prospective declaratory relief.

### b. Alternative Remedies

The parties also disagree as to whether there are more effective alternative remedies available to Plaintiffs than seeking declaratory relief. Defendants argue that because an alternative remedy exists, Plaintiffs lack a basis for declaratory relief. *See Lawrence*, 271 F. App'x at 766 (citing *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994)). However, "a request for declaratory relief may be considered independently of whether other forms of relief are appropriate." *Powell v. McCormick*, 395 U.S. 486, 518 (1969); Fed. R. Civ. P. 57. Indeed, such consideration is discretionary. *See Philips Med. Cap., LLC v. Med. Insights Diagnostics Ctr., Inc.*, 471 F.Supp.2d 1035, 1048 (N.D. Cal. 2007); *In re Young*, 2012 WL 5832431, at *7 n.16 (C.D. Cal. Nov. 13, 2012). Whether an alternative remedy is more effective depends on the nature of the injury alleged.

Here, Defendants argue that Plaintiffs' alternative remedy would be filing a writ. However, unlike the cases on which Defendants rely to support this argument, there is no court order at issue here. In *Phillips*, a judge signed an order allowing media to be present during family-court proceedings, 2024 WL 4267821, at *1, and, in *Lawrence*, a judge entered default judgment, 271 F. App'x at 765. But here, Defendants sent an email. This undercuts their argument that Plaintiffs could seek more effective alternative remedies because a challenge to a suspension initiated by email does not have a clear remedy in the law. Defendants also rely on *City of Helena v. Buck*, 806 P.2d 27 (Mont. 1991), however this case regards failure to pay and a final order of forfeiture, which are not at issue here because the Harmon bond forfeiture was paid.

Further, filing a writ as to a criminal case in which Bad Boy was prohibited from writing a bond, as Defendants suggest, would not remedy the blanket suspension of Bad Boy's bonding privileges. First, each writ application would be as to a specific case, rather than the general suspension. Second, under Montana law, the procedure for a writ application requires "the party to whom [the writ] is directed to certify fully to the court issuing the writ . . . a transcript of the record and proceedings." Mont. Code. Ann. § 27-25-202. Again, the suspension at issue would not be on the official record as it was communicated via email. Lastly, even if filing writs was an alternative remedy, it does not appear to be more effective

than seeking declaratory relief because such a process would be time-consuming, economically unsound, and an obtuse business practice.

Accordingly, there does not appear to be a more effective alternative remedy available to Plaintiffs than seeking declaratory relief.

### c.  Conclusion

Ultimately, Defendants do not provide a basis for denying declaratory relief at the pleading stage.  Therefore, Defendants' motion to dismiss as to the declaratory relief claims is denied.

## III.    Motions to Strike

Defendants moved to strike Plaintiffs' motion for leave to file four documents under seal, (Docs. 19, 30), and paragraphs from the Amended Complaint, (Docs. 32, 37).  Defendants have now notified the Court that they withdraw part of their motion to strike, (Doc. 30), Plaintiffs' motion to file under seal, (Doc. 19), and their motion to strike, (Doc. 37), paragraphs from the Amended Complaint, (Doc. 32), because the Judicial Standards Commission has dismissed Looney's complaints against them, meaning Defendants consider the Commission "complaints and outcome are no longer confidential."  (Doc. 43.)  At this point in the case, nothing shall be stricken.

### a.  Motion to Strike Documents (Doc. 30)

Defendants' motion to strike Plaintiffs' motion for leave to file four documents under seal, (Doc. 30), is denied. This motion sought to strike the Plaintiffs' motion on two grounds: confidentiality and lack of necessity. Specifically, Defendants argue that the two complaints filed by Looney against Defendants with the Montana Judicial Standards Commission and the two letters regarding these complaints are confidential and unnecessary to resolve the dispute. Following Defendants' withdrawal of part of their motion to strike, (Doc. 30), the only remaining part of this motion argues that the documents are unnecessary to resolving the case. (Doc. 31 at 7.)

Generally, motions to strike should be denied unless the matter has no logical connection to the controversy at issue and may prejudice a party to the suit. *See* Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1382 (1990). Rule 12(f) of the Federal Rules of Civil Procedure states, in relevant part, that a "court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. Rule 12(f). Relevant here, a "[r]edundant matter is defined as allegations that constitute a needless repetition of other averments or are foreign to the issue." *Sliger v. Prospect Mortg., LLC*, 789 F. Supp. 2d 1212, 1216 (E.D. Ca. 2011) (internal quotation marks omitted). An immaterial matter "has no essential or important relationship to the claim for relief or defenses being plead[,]" while an impertinent matter "consists of statements that

do not pertain, and are not necessary, to the issues in question." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) (internal citations and quotation marks omitted).   The Amended Complaint sufficiently demonstrates that the lodged documents, which address the very misconduct alleged here, are relevant, material, and pertinent to the case.  (Doc. 32 at 60–65, 71, 81–83.)

### b. Motion to Strike Paragraphs of Amended Complaint (Doc. 37)

Since Defendants have notified the Court of their intention to withdraw their motion to strike paragraphs of the Amended Complaint, (Doc. 43), this motion, (Doc. 37), is denied as moot.

### CONCLUSION

Based on the foregoing, IT IS ORDERED that Defendants' motion to dismiss, (Doc. 35), is DENIED, their motion to strike Plaintiffs' motion for leave to file documents under seal, (Doc. 30), is DENIED, and their motion to strike paragraphs of the Amended Complaint, (Doc. 37), is DENIED AS MOOT.

DATED this 17ᵗʰ day of March, 2025.

Donald W. Molloy, District Judge
United States District Court